Roy JERELDS, James H. Hill, and Reginald Pride, Plaintiffs,

v.

THE CITY OF ORLANDO, a municipal corporation, and Donald Harkins, individually, Defendants.

No. 6:98CV876–ORL31 JGG.

United States District Court, M.D. Florida, Orlando Division.

March 27, 2002.

Jacob A. Rose, The Rose Law Firm, P.A., West Palm Beach, FL, Don Stephens, Bernard A. Lebedeker, Olds & Stephens, P.A., West Palm Beach, FL, Larry H. Colleton, P.A., Richard Burton Bush, Bush, Brooks & Augspurger, P.A., Tallahassee, FL, for Plaintiffs.

Thomas C. Garwood, Jr.,Lori R. Benton, Daniel P. O'Gorman, Ford & Harrison LLP, Orlando, FL, Arthur Randell Brown, Jr., Jackson, Lewis, Schnitzler & Krupman, Orlando, FL, for Defendants.

### ORDER

PRESNELL, District Judge.

This cause came on for consideration on the Report and Recommendation ("R & R") of the Magistrate Judge (Doc. 289), the Plaintiffs' objections thereto (Docs. 290 & 294), and the Defendant's response to those objections (Doc. 299). The Court has reviewed these documents and the accompanying memoranda and affidavits *de novo*, reviewed the transcripts of the hearings held before the Magistrate Judge, heard testimony of the parties and their attorneys at the evidentiary hearing held on October 17, 2001, reviewed the written arguments of counsel following the evidentiary hearing, and is otherwise fully advised in the premises.

### I. PROCEDURAL HISTORY AND FACTUAL BACKGROUND

The facts of this case have been fully detailed in the "Factual Background" section of the R & R (Doc. 289) that is the subject of this Order and the Court's previous orders (Docs. 240 & 244). However, for purposes of this Order, some discussion of those facts, as well as the additional facts adduced at the evidentiary hearing, is necessary.

Plaintiffs Jerelds, Hill, and Pride worked for the City of Orlando ("City") as firefighters. In order to be promoted to lieutenant, district chief, or assistant chief, candidates must pass an examination. All who pass the examination are placed on the eligibility list and the fire chief selects the person whom he believes is the best candidate for the position from the eligibility list. These selections are subject to administrative review.

In 1995, both Hill and Pride passed the examination for promotion to district chief. Therefore, they were placed on the eligibility list with twenty-six other candidates. In 1996, Chief Harkins promoted three Caucasian candidates from the list. The Civil Service Board approved Harkin's recommendations for promotion to district chief without opposition or challenge.[1]

Also in 1995, Jerelds took the examination for assistant chief, which he failed. Jerelds filed an appeal with the Civil Service Board challenging his failure of the examination. A hearing was held and the Board rejected Jerelds' challenge and request to be placed on the assistant chief eligibility list. Subsequently, Jerelds filed a charge with the EEOC claiming racial discrimination. On June 17, 1997, the EEOC issued a Letter of Determination finding that there was reasonable cause to believe that "Title VII of the Civil Rights Act of 1964 was violated and that the Plaintiffs and other similarly situated blacks were victims of discrimination as well."

---

1. Neither Hill nor Pride sought review of the 1996 promotions from the Civil Service Board.

Prior to the 1998 district chief examination, Chief Harkins strongly encouraged all candidates on the 1995 district chief eligibility list to take the 1998 examination, promising to give them additional consideration.[2] Neither Hill nor Pride took the 1998 examination. Nevertheless, Hill and Pride remained on the merged district chief eligibility list along with eighteen other candidates. Although Chief Harkins recommended two Caucasian candidates for promotion in 1998, neither Hill nor Pride sought administrative review of the 1998 promotions.

On July 20, 1998, Plaintiffs Jerelds, Hill, and Pride filed a class action complaint against the City of Orlando under 42 U.S.C. § 1981 based upon a theory of disparate impact claiming that Harkin's requirement of a paramedic certification and a four-year degree, when combined, had a disparate impact on the black promotional candidates for the district chief and assistant chief positions.[3] Plaintiffs also filed individual claims against the City alleging violations of Title VII, 42 U.S.C. § 1983, and § 1981 based upon a theory of disparate treatment. Additionally, Jerelds claimed racial discrimination in the grading of the 1995 assistant chief examination that he had failed.

In June 1999, Plaintiffs amended their complaint to add a retaliation claim on behalf of Jerelds and to add Chief Harkins as a defendant to the § 1981 and § 1983 claims. Defendants moved for dismissal on the grounds that Chief Harkins was entitled to qualified immunity. On August 19, 1999, Plaintiffs amended their complaint a second time to add a claim based on a new legal theory of Title VII disparate impact. Defendants again moved for dismissal, or in the alternative, partial summary judgment asserting that Chief Harkins was entitled to qualified immunity.[4] In April 2000, Defendants moved for summary judgment on the remaining claims. In August 2000, this Court granted summary judgment in favor of the Defendants on all of Plaintiffs' claims.[5]

Subsequently, Defendants moved for Attorney's Fees and Costs (Doc. 250), and Plaintiffs filed their Opposition (Doc. 260). On November 16, 2000, the Magistrate Judge heard arguments on Defendants' Motion (Doc. 265). The Magistrate Judge directed Defendants to file a proposed order. Plaintiffs objected to the proposed order filed by the Defendants and to the hours billed, but did not provide a reason for their objection, as required (Docs. 280 & 282).

Thereafter, the Magistrate Judge filed a well-reasoned and extremely thorough R & R granting in part and denying in part Defendants' motion for fees (Doc. 289). In the R & R, the Magistrate Judge found that Plaintiffs and their counsel had taken "a simple case and artificially inflated it into a class action and multi-count complaint without any basis in law or fact." (*Id.* at 1). Accordingly, the Magistrate Judge recommended that both Plaintiffs and their counsel be liable for over $200,000.00 in fees and costs incurred by the City. Plaintiffs and their counsel filed

---

**2.** In 1998, before the district chief examination and the filing of this suit, the Civil Service Rules were amended to provide that the eligibility list for district chief would expire every two years. The rules further provided that the 1998 district chief eligibility list would be the last "merged list" and would thus expire in 2000 when the Civil Service Board certified a new list.

**3.** Pride possessed a four-year degree, but not a paramedic certification.

**4.** After receiving Defendants' letter indicating that the City would seek Rule 11 sanctions if Jerelds did not withdraw his retaliation claim, Jerelds withdrew the claim.

**5.** In April 2001, the Eleventh Circuit affirmed the judgment.

objections with accompanying memoranda and affidavits. (Docs. 290, 291, 294, 295, & 296). Defendants filed their Response and accompanying affidavits. (Docs. 299, 304, 305, & 307). On October 17, 2001, this Court held an evidentiary hearing on the matter in which it heard oral argument and testimony of the Plaintiffs and their attorneys. (Doc. 314). Following the hearing, the parties submitted additional briefs. (Docs. 311, 313, 315, & 316).

At the evidentiary hearing, the Court heard the following evidence. Attorney Don Stephens testified that when the City Attorney from Riviera Beach contacted him about the Plaintiffs' claims, Stephens advised the Plaintiffs to contact Attorney Jacob Rose who practiced in federal court and also handled civil rights claims. Stephens, along with Rose, the City Attorney for Riviera Beach, and Attorney Bernard Lebedeker met with the Plaintiffs and fourteen other African–American firefighters in December 1996 to hear the firefighters' complaints and decide whether to take the case. However, counsel did not take the Plaintiffs' case immediately. Rather, they met with the three Plaintiffs and a potential fourth plaintiff, whose case the attorneys refused to take, and explained to them the process and necessary expenditures to prosecute the case. It was only at this point that the attorneys decided to take the Plaintiffs' case.

The attorneys decided to wait on the receipt of the EEOC determination letter before they filed suit. The reason they waited was because Stephens knew how difficult it was to get a reasonable cause letter and that without one it was difficult to prove race discrimination. Stephens indicated that only 2.2% of all EEOC claims result in a finding of reasonable cause.

Stephens admitted to writing a letter to the City in September 1997 threatening a boycott unless the City agreed to the Plaintiffs' non-negotiable demands. He claimed that the use of the threatening language was at the insistence of one of the Plaintiffs. Stephens also admitted that, in hindsight, he never should have sent that letter. He indicated that the letter was sent to the City because the EEOC investigator stated that the City was being uncooperative. Stephens contacted the City after the letter was sent to try and resolve the matter, but his efforts were unsuccessful.

After receiving the EEOC determination letter, an extensive research memorandum was prepared and reviewed with the Plaintiffs prior to filing suit. However, the attorneys abstained from filing suit until they received the right to sue letter from the EEOC. The attorneys also contacted Mr. Spriggs, an attorney in Tallahassee, Florida, who specializes in class action cases. Once the suit was filed, the attorneys required Plaintiffs to pay for costs including the cost to copy the City's records, which was approximately $7,000.00. The attorneys indicated that they did this because the attorneys wanted the Plaintiffs to have a stake in the litigation. Also, the Plaintiffs paid for the costs of examining all of the raw data provided in discovery by the Defendants, which totaled approximately $5,000.00.

The attorneys testified that they divided the work between themselves and that they and a paralegal poured over the thousands of documents received in discovery. Additionally, the attorneys also consulted with Dr. Brandon, an expert on disparate impact. Although Dr. Brandon was not used because there were not enough persons for a proper statistical analysis, Dr. Brandon determined that because the City had promoted no African–Americans, then the Plaintiffs met the EEOC's required 4/5's rule. Finally, counsel thought that the testimony of the City's Human Re-

source Director supported the Plaintiffs' claims of discrimination.

In August 2000, the Magistrate Judge presided as mediator at a settlement conference between the parties. At the conference, the Defendants did not offer any money or promotion to the Plaintiffs, but they did offer to waive approximately $400,000.00 in attorney's fees if Plaintiffs abandoned their claims. According to the attorneys, prior to August 2000, no one including Defendants' counsel had ever indicated that Plaintiffs' suit was frivolous or brought in bad faith.

## II. ANALYSIS

In their motion for fees and costs, Defendants seek attorney's fees and costs pursuant to 42 U.S.C. § 1988, 28 U.S.C. § 1927, and this Court's inherent power.[6] The Magistrate Judge recommended an award of fees under 42 U.S.C. § 2000e–5(k), 42 U.S.C. § 1988, and 28 U.S.C. § 1927.

### A. Entitlement to Fees as a Prevailing Party under 42 U.S.C. § 1988

█ Ordinarily, a prevailing plaintiff in Title VII cases "is to be awarded attorney's fees in all but special circumstances." *Christiansburg Garment Co. v. E.E.O.C.*, 434 U.S. 412, 417, 421, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978). By contrast, a more stringent standard applies to prevailing defendants who may be awarded attorney's fees only when a court finds that the plaintiff's claim was "frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." *Id.* at 421, 98 S.Ct. 694. This standard applies equally to awards of attorney's fees sought

under 42 U.S.C. § 1988 by prevailing civil rights defendants. *Head v. Medford*, 62 F.3d 351, 355 (11th Cir.1995) (citing *Hughes v. Rowe*, 449 U.S. 5, 14, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980)). Section 1988(b) permits a court to award attorney's fees to the "prevailing party" for actions brought "to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318, or title VI of the Civil Rights Act of 1964 [42 U.S.C. § 2000d *et seq.*] ...." *See generally U.S. Steel, LLC, v. Tieco, Inc.*, 261 F.3d 1275, 1294 (11th Cir.2001); *Zaklama v. Mount Sinai Med. Ctr.*, 906 F.2d 645, 648 n. 2 (11th Cir.1990).

█ Clearly, Defendants were the prevailing party in this case. However, the fact that a plaintiff may ultimately lose his case is not in itself a sufficient justification for the assessment of fees. *Hughes*, 449 U.S. at 14, 101 S.Ct. 173 (applying *Christiansburg* standard to attorney's fees award under § 1983). Further, even if the law or the facts are somewhat questionable or unfavorable at the outset of litigation, a party may have an entirely reasonable ground for bringing suit. *Id.* at 15, 101 S.Ct. 173 (citing *Christiansburg*, 434 U.S. at 422, 98 S.Ct. 694). Hence, a plaintiff may be assessed fees if he continues to litigate a once colorable claim after it becomes obvious that the claim is frivolous, unreasonable, or groundless. *Christiansburg*, 434 U.S. at 422, 98 S.Ct. 694. In determining whether to assess attorney's fees, the district court must examine (1) whether the plaintiff established a prima facie case, (2) whether the defendant offered to settle, and (3) whether the trial court dismissed the case prior to trial or

---

**6.** Although Defendants did not expressly request fees under 42 U.S.C. § 2000e–5(k) in their motion (Doc. 250), Defendants did assert this as a basis in their memorandum in support of fees. (Doc. 252). Because Plaintiffs did not raise Defendants' procedural fail-

ure as an issue in their opposition to fees, Plaintiffs have implicitly waived any objection on this issue. Moreover, Defendants' entitlement to fees under 42 U.S.C. § 2000e–5(k) has been fully briefed and litigated.

held a full-blown trial on the merits. *Sullivan v. School Bd. of Pinellas County*, 773 F.2d 1182, 1189 (11th Cir.1985); *Turner v. Sungard Bus. Sys., Inc.*, 91 F.3d 1418, 1422 (11th Cir.1996). In other words, the district court must focus on the question of whether the case is seriously lacking in arguable merit. *Sullivan*, 773 F.2d at 1189.

■ As the Magistrate Judge correctly determined in the R & R, the *Sullivan* factors support an award of fees to the Defendants. (Doc. 289 at 21–34). First, Plaintiffs failed to establish a prima facie case on their claims. Rather, the Court only presumed for purposes of summary judgment that Plaintiffs established a prima facie case on the disparate treatment claim. A review of the record reveals that the majority of Plaintiffs' claims, including the motion for class certification, were patently frivolous with no credible evidentiary support.[7] *See Roper v. Edwards*, 815 F.2d 1474, 1478 (11th Cir.1987) (attorney's fees award proper where plaintiffs introduced absolutely no evidence to support their claims). Second, since the Defendants did not offer Plaintiffs a promotion or a monetary settlement, this factor weighs in favor of the Defendants.[8] Finally, the entire case was decided on a dispositive motion in favor of Defendants, rather than after a trial on the merits. Accordingly, Defendants are entitled to reasonable fees from the Plaintiffs pursuant to 42 U.S.C. § 1988, as well as 42 U.S.C. § 2000e–5(k).[9]

**B. Entitlement to Fees Under 28 U.S.C. § 1927**

In their Motion, Defendants urge this Court to find Plaintiffs' counsel liable for attorney's fees under 28 U.S.C. § 1927. Defendants argue that Plaintiffs' claims were not only frivolous, but also brought in bad faith.

■ Section 1927 provides that "[a]ny attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. Section 1927 is penal in nature and must be strictly construed. *Id.* (citing *Monk v. Roadway Express, Inc.*, 599 F.2d 1378, 1382 (5th Cir.1979), *aff'd sub nom., Roadway Express, Inc. v. Piper*, 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980)) (declaring that § 1927 is not a "catch-all" provision for sanctioning objectionable conduct by counsel).[10] Moreover, the legislative history of the statute is sparse, and the cases interpreting it are not very helpful in divining the congressional purpose. *United States v. Ross*, 535 F.2d 346, 349 (6th Cir.1976). The Eleventh Circuit has acknowledged that "there is little case law in th[e] circuit concerning the standards applicable to the award of sanctions under § 1927." *Peterson v. BMI Refractories*, 124 F.3d 1386, 1395 (11th Cir.1997).

---

7. Although the frivolity of the Plaintiffs' claims may not have been apparent at the outset of the litigation, it was abundantly clear at the close of discovery that no evidence existed to substantiate Plaintiffs' assertions.

8. Although Defendants offered to waive a claim for its attorney's fees in exchange for a settlement, this is not the type of settlement offer which benefits Plaintiffs under the *Sullivan* analysis.

9. To the extent that Plaintiffs' attorneys pursued frivolous claims on behalf of their clients without educating the clients of the potential consequences, the clients' remedy against the attorneys is a suit for malpractice.

10. All decisions of the Fifth Circuit prior to October 1, 1981 are binding precedent on this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

■ The plain language of the section sets forth three requirements to justify an imposition of sanctions: (1) an attorney must engage in "unreasonable and vexatious" conduct; (2) such "unreasonable and vexatious" conduct must "multipl[y] the proceedings"; and (3) the amount of the sanction cannot exceed the costs occasioned by the objectionable conduct. *McMahan v. Toto*, 256 F.3d 1120, 1128 (11th Cir.2001) (citing *Peterson*, 124 F.3d at 1396). Vexatious is not defined in the statute. When words are not defined in the statute, they "must be given their ordinary meaning." *Chapman v. United States*, 500 U.S. 453, 462, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991). Webster's Third New International Dictionary (1971) defines "vexatious" as "lacking justification and intended to harass." *Ross*, 535 F.2d at 349; *see also Voss v. USS Great Lakes Fleet, Inc.*, 35 F.3d 567, unpubl. op. (6th Cir.1994); Black's Law Dictionary 1559 (7th ed.1999) (defining "vexatious" as "without reasonable or probable cause or excuse").

Some courts have construed the language "unreasonably and vexatiously" to require a showing of intent, recklessness, or bad faith. *Optyl Eyewear Fashion Int'l Corp. v. Style Cos., Ltd.*, 760 F.2d 1045, 1048 (9th Cir.1985); *United States v. Blodgett*, 709 F.2d 608, 610 (9th Cir.1983); *Baker Indus., Inc. v. Cerberus*, 764 F.2d 204, 208 (3rd Cir.1985); *West Virginia v. Charles Pfizer & Co.*, 440 F.2d 1079 (2d Cir.1971). Other courts have ruled that § 1927 does not require a demonstration of subjective bad faith as a precondition to the imposition of sanctions. Rather, these courts have stated that § 1927 requires a more relaxed, objective standard that does not require conscious impropriety. *Knorr Brake Corp. v. Harbil, Inc.*, 738 F.2d 223, 226–27 (7th Cir.1984); *In re Ruben*, 825 F.2d 977, 983–84 (6th Cir.1987); *Jones v. Continental Corp.*, 789 F.2d 1225, 1230 (6th Cir.1986); *Lewis v. Brown & Root,*

*Inc.*, 711 F.2d 1287, 1291–92 (5th Cir.1983); *see also Cruz v. Savage*, 896 F.2d 626, 631–32 (1st Cir.1990) and cases cited therein ("Behavior is 'vexatious' when it is harassing or annoying, regardless of whether it is intended to be so. . . . It is enough that an attorney acts in disregard of whether his conduct constitutes harassment or vexation, thus displaying a 'serious and studied disregard for the orderly process of justice.' ").

■ All of the courts, including those applying a lesser standard, at minimum agree that merely unintended, inadvertent, and negligent acts will not support the imposition of sanctions under § 1927. *Cruz*, 896 F.2d at 632; *Ruben*, 825 F.2d at 984. Rather, the power to impose sanctions under § 1927 should be exercised "only in instances of a serious and studied disregard for the orderly processes of justice." *Kiefel v. Las Vegas Hacienda, Inc.*, 404 F.2d 1163, 1167 (7th Cir.1968) (concluding that Congress intended to impose a sanction on conduct more culpable than mere unintentional discourtesy to a court when it conjoined the word "vexatiously" with "unreasonably").

■ Here, although Plaintiffs' counsel might have had a good faith basis in law and fact for filing some of Plaintiffs' claims, ultimately all of the Plaintiffs' claims proved to be frivolous. Counsel continued to pursue these claims on behalf of their clients after the close of discovery—the point at which they should have known that there was no evidentiary support for Plaintiffs' claims. However, something more than a lack of merit is required for § 1927 sanctions or they would be due in every case. *McMahan*, 256 F.3d at 1129.

■ Although not expressly addressing the issue before this Court, the Eleventh Circuit has stated that, a court may "as-

sess attorney's fees against litigants, counsel, and law firms who willfully abuse the judicial process by conduct tantamount to bad faith." *Malautea v. Suzuki Motor Co., Ltd.,* 987 F.2d 1536, 1544 (11th Cir. 1993) (quoting *Avirgan v. Hull,* 932 F.2d 1572, 1582 (11th Cir.1991) (citation omitted) (affirming assessment of fees under § 1927 and Rule 11)). Except for the "boycott" letter,[11] there is no evidence that Plaintiffs' counsel pursued these claims in bad faith or with any intent to harass or annoy the Defendants. Rather, counsel investigated Plaintiffs' claims, waited on the EEOC determination letter, reviewed each and every personnel record and document produced in discovery, and spoke with learned authors and practitioners about the case.[12]

Having had the benefit of counsels' testimony and the ability to judge their demeanor—benefits which the Magistrate Judge did not have—this Court rejects the notion that counsel litigated for an improper purpose or in bad faith. Counsel obviously exhibited extremely poor judgment in their zeal to prosecute these claims. In their overzealousness, they lost sight of their roles as advocates, counselors, and officers of the court. This, however, is not conduct tantamount to bad faith. Accordingly, counsel should not be held liable for attorney's fees under 28 U.S.C. § 1927.[13]

### III. CONCLUSION

Based on the foregoing, it is therefore **ORDERED AND ADJUDGED** that:

1) Plaintiffs' and Plaintiffs' counsels' objections to the R & R are **SUSTAINED IN PART** and Defendants' motion is **GRANTED IN PART;**

2) Prevailing party fees are imposed against Plaintiffs Jerelds,[14] Hill, and Pride, jointly and severally, in the following amounts

 a) $252,791.90 in attorney's fees,

 b) $426.67 in costs,

 c) for a total of $253,218.57; and

3) The Clerk is directed to enter judgment accordingly.

### REPORT AND RECOMMENDATION

GLAZEBROOK, United States Magistrate Judge.

Plaintiffs Roy Jerelds, James Hill, and Reginald Pride commenced this action against the City of Orlando's Fire Depart-

---

**11.** The Court is troubled by the "boycott" letter, which could lead a reasonable person to believe that this litigation was pursued with subjective bad faith. However, the Court declines to award fees based on the letter.

**12.** This case is unlike *Byrne v. Nezhat,* 261 F.3d 1075, 1106 (11th Cir.2001) where the district court awarded sanctions against the attorneys for bringing frivolous claims because they failed to conduct a reasonable inquiry into the factual bases of the claims. Here, the lack of inquiry was not the problem. Rather, it was the failure of counsel to take an objective look at the voluminous facts unearthed by their extensive discovery and conclude that Plaintiffs' claims lacked merit.

**13.** This Court rejects the use of its inherent power to impose sanctions. The Eleventh Circuit has explained that "[t]he key to unlocking a court's inherent power is a finding of bad faith." *Byrne,* 261 F.3d at 1106 (quoting *Barnes v. Dalton,* 158 F.3d 1212, 1214 (11th Cir.1998)); *In re Mroz,* 65 F.3d 1567, 1575 (11th Cir.1995) (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)) ("Invocation of a court's inherent power requires a finding of bad faith."). Because Plaintiffs' counsel did not litigate in bad faith, this Court will not exercise its inherent power to impose additional sanctions on counsel.

**14.** Because Jerelds withdrew his retaliation claim after receiving the Defendants' letter threatening the pursuit of Rule 11 sanctions, this Court declines to follow the Magistrate Judge's recommendation to award fees on that claim.

ment [Fire Department] and former Fire Chief Donald Harkins for alleged race discrimination regarding certain promotions. Plaintiffs and their counsel took a very simple case and artificially inflated it into a class action and multi-count complaint without any basis in fact or law. This forced defendants to incur significant time and expense in demonstrating the frivolty of plaintiffs' claims. Defendants seek to recover over $417,538.00 in attorney's fees plus expenses from plaintiffs and their counsel under 42 U.S.C. § 2000e–5(k), 42 U.S.C. § 1988, 42 U.S.C. § 1927, and this Court's inherent power.[1] For the reasons detailed below, the undersigned **RECOMMENDS** that defendants' motion for attorney's fees and expenses [Docket No. 250] be **GRANTED** in part and **DENIED** in part.

## I. *THE LAW*

### A. Standard for Attorney's Fees under 28 U.S.C. § 1927

28 U.S.C. § 1927 governs counsel's liability for excessive costs. It provides as follows:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct.

28 U.S.C. § 1927. The word "vexatious" is not defined in the statute. In such circumstances, courts typically read statutory terms to convey their ordinary meaning. *See Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health & Human Servs.*, 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001) (relying on definition of

"prevailing party" in Black's Law Dictionary). Black's Law Dictionary defines the term "vexatious" to mean "without reasonable or probable cause or excuse; harassing; annoying." Black's Law Dictionary 1559 (7th ed.1999). It further defines "vexatious suit" to mean a "lawsuit instituted maliciously and without good cause." *Id.* Standard English-language dictionaries give the term similar meaning. *See, e.g.*, Webster's Third New Int'l Dictionary 2548 (3d ed.1961) (defining "vexatious" to mean "lacking justification and intended to harass"); 19 Oxford English Dictionary 596 (2d ed.1989) (defining "vexatious" for legal purposes as "[i]nstituted without sufficient grounds for the purpose of causing trouble or annoyance to the defendant").

There is little case law in the United States Court of Appeals for the Eleventh Circuit articulating the standards applicable to an award of attorney's fees under § 1927. *Peterson v. BMI Refractories,* 124 F.3d 1386, 1395 (11th Cir.1997). Moreover, decisions from other circuits are not in agreement on the governing principles. Some circuits have held that subjective bad faith is required for an award under § 1927. *Oliveri v. Thompson,* 803 F.2d 1265, 1273 (2d Cir.1986); *Hackman v. Valley Fair,* 932 F.2d 239, 242 (3d Cir. 1991). Other circuits have held that it is not. *See Wilson–Simmons v. Lake County Sheriff's Dep't,* 207 F.3d 818, 824 (6th Cir.2000); *Miera v. Dairyland Ins. Co.,* 143 F.3d 1337, 1342 (10th Cir.1998).

While the Eleventh Circuit has not specifically required a finding of subjective bad faith, it has stated that § 1927 allows district courts to assess attorney's fees against counsel and law firms who willfully abuse the judicial process by "conduct *tantamount* to bad faith." *Avirgan v. Hull,*

---

[1] It is noted that the defendants do not base a claim for attorney's fees against plaintiffs' counsel upon Fed.R.Civ.P. 11. Accordingly, the Court does not consider those grounds for attorney's fees.

932 F.2d 1572, 1582 (11th Cir.1991) (emphasis added); *Roadway Express Inc. v. Piper,* 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980). Additionally, the Eleventh Circuit has agreed with the Ninth Circuit that "[a] finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument." *Barnes v. Dalton,* 158 F.3d 1212, 1214 (11th Cir.1998) (quoting *Primus Automotive Fin. Servs., Inc. v. Batarse,* 115 F.3d 644, 649 (9th Cir.1997)). The Eleventh Circuit has also warned that "[w]hen it becomes apparent that discoverable evidence will not bear out the claim, the litigant and his attorney have a duty to discontinue their quest." *Avirgan,* 932 F.2d at 1582.

 The purpose of § 1927 is to deter frivolous litigation and abusive practices by attorneys and to ensure that those who create unnecessary costs bear them. *O'Rear v. American Family Life Assurance Co. of Columbus, Inc.,* 144 F.R.D. 410, 413 (M.D.Fla.1992). Section 1927 "does not distinguish between winners and losers, or between plaintiffs and defendants.... It is concerned only with limiting the abuse of court processes." *Roadway Express,* 447 U.S. at 762, 100 S.Ct. 2455.

**B. The "Bad Faith" Standard**

The American Rule prohibits fee shifting as a general rule. *See Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 257, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). As an exception to the American Rule, however, the district court may award attorney's fees when a losing party has "acted in bad faith, vexatiously, wantonly or for oppressive reasons." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44—46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); *Alyeska Pipeline,* 421 U.S. at 258—59, 95 S.Ct. 1612; *Barnes v. Dalton,* 158 F.3d 1212, 1214 (11th Cir.1998); *In re Mroz,* 65

F.3d 1567, 1575 (11th Cir.1995); *Kreager v. Solomon & Flanagan, P.A.,* 775 F.2d 1541, 1543 (11th Cir.1985). A federal court may exercise its *inherent power* to sanction bad faith misconduct even if that conduct could be sanctioned under a statute or procedural rule. *See Chambers,* 501 U.S. at 49—51, 111 S.Ct. 2123. However, when bad faith conduct in the course of litigation could be adequately sanctioned under the rules, the court ordinarily should rely on the rules and not on its inherent power. *Id.*

The bad faith exception to the American Rule is not limited to conduct at the moment of filing, but also incorporates bad faith acts preceding and during litigation. *See* 775 F.2d at 1543. A finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent. *Barnes,* 158 F.3d at 1214. A party also demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order. *Barnes,* 158 F.3d at 1214. In assessing whether an award is proper under the bad faith standard, "the inquiry will focus primarily on the conduct and motive of a party, rather than on the validity of the case." *See Rothenberg v. Security Management Co., Inc.,* 736 F.2d 1470, 1472 (11th Cir.1984).

The invocation of the court's inherent power to sanction requires a finding of bad faith after the party is afforded a due process opportunity to be heard. *See Chambers,* 501 U.S. at 49, 111 S.Ct. 2123; *In re Mroz,* 65 F.3d 1567, 1575—76 (11th Cir.1995). Inherent powers must be exercised with restraint and discretion. *Barnes,* 158 F.3d at 1214. A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process. 501 U.S. at 44—45, 111 S.Ct. at 2132—33.

*See also Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 23 F.3d 374, 377—78 (Fed.Cir.1994) (recognizing that under certain circumstances a court can award expert witness fees as a sanction pursuant to its inherent power).

### C. Attorney's Fee Provisions—Title VII and 42 U.S.C. § 1988

The United States Congress has determined that a court, in its discretion, may award reasonable attorney's fees, including expert fees, under Title VII and under § 1988 to a prevailing party as part of its costs. *See* 42 U.S.C. § 2000e–5 (k); 42 U.S.C. § 1988(b); *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 416, 421—22, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978). Entitlement to attorney's fees by a prevailing party under Title VII is governed by the United States Code, which provides:

> In any action or proceeding under this subsection, the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (*including expert fees* ) as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.

42 U.S.C. § 2000e–5 (k) (emphasis supplied). Similarly, § 1988(b) provides in relevant part:

> In any action or proceeding to enforce ... [42 U.S.C. § 1983] ... the court, in its discretion, may allow the prevailing party ..., a reasonable attorney's fee as part of the costs.

42 U.S.C. § 1988(b). Congress specifically drew the language of § 1988(b) from preexisting fee provisions like those in Ti-

tle VII (*i.e.,* § 2000e–5(k)). Congress intended that the standards for awarding fees under § 1988 be the same as those under the fee provisions of the 1964 Civil Rights Act. Thus, courts interpret § 2000 e–5(k) and § 1988(b) in tandem when addressing the propriety of awarding attorney fees to a prevailing civil rights party.

The attorney's fee statutory provisions, however, are not self-executing. The statutes do not inform the judge as to what factors are relevant to the exercise of his discretion or as to what standards to apply. Given the numerous ways in which litigation can come to an ultimate conclusion, the statutes also do not provide the judge with guidance about when a party should be considered a "prevailing party." Congress left these difficult issues for judicial interpretation.

#### 1. When Does a Civil Rights Party "Prevail"

 Congress has employed the legal term of art "prevailing party" in numerous statutes authorizing awards of attorney's fees. *See, e.g.,* 42 U.S.C. § 3616(c)(2); ADA, 42 U.S.C. § 12205; Title VII, 42 U.S.C. § 2000e–5(k); 42 U.S.C. § 1988(b). On May 29, 2001, the Supreme Court defined a "prevailing party" for purposes of a fee-shifting statute as a "party in whose favor a judgment is rendered, regardless of the damages award."[2] *Buckhannon Board and Care Home, Inc. v. West Virginia Department of Health and Human Resources,* 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). To prevail, a party *must* be awarded *some relief* by a court. 121 S.Ct. at 1840 (emphasis added). This may take the form of a judgment on

---

**2.** The *Buckhannon* Court's definition of a "prevailing party" was specifically written to apply under the FHAA, 42 U.S.C. § 3613(c)(2) and ADA, 42 U.S.C. § 12205. The Supreme Court, however, noted in dicta that the "pre-

vailing party" provisions in certain other fee-shifting statutes should be interpreted consistently, and listed 42 U.S.C. § 2000e–5(k) and 42 U.S.C. § 1988.

the merits or a court-ordered consent decree. *Id.* Both create the "material alteration of the legal relationship of the parties" which is necessary to a fee award. *Id.*

■ Contrary to plaintiffs' suggestions, a party need not succeed on all issues in order to be deemed a "prevailing party." A party needs only to "establish his entitlement to *some relief* on the merits of his claims in the trial court or on an appeal." 121 S.Ct. at 1840. As explained by the Eleventh Circuit:

> To be a prevailing party [a] party need not prevail on all issues to justify a full award of costs, however. Usually the litigant in whose favor judgment is rendered is the prevailing party for purposes of rule 54(d) .... A party who has obtained some relief usually will be regarded as the prevailing party even though he has not sustained all his claims .... 10 *Wright & Miller, supra,* § 2667, p. 129–130. Cases from this and other circuits consistently support shifting costs if the prevailing party obtains judgment on even a fraction of the claims advanced.

*Head v. Medford,* 62 F.3d 351, 354 (11th Cir.1995) (quoting from *United States v. Mitchell,* 580 F.2d 789, 793–94 (5th Cir. 1978) (citations omitted)). Thus, the outer boundary of the term "prevailing party" is that a party must receive at least some relief on the merits of a claim before being considered a "prevailing party." *See Hewitt v. Helms,* 482 U.S. 755, 759—60, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987).

This flexible rule allows the courts to balance the concerns for encouraging vigorous enforcement of civil rights against discouraging frivolous litigation within the specific and unique context of each individual case. Accordingly, where a defendant has prevailed on the merits of some of his claims, he may be deemed a prevailing party entitled to all costs (including fees) incurred in defending the suit. Under this standard, a prevailing party can redress those rare abusive situations in which a civil rights plaintiff files a blatantly frivolous claim, and then simply dismisses those claims voluntarily to avoid a judicial determination on the merits.

### 2. Standard Applicable to Prevailing Civil Rights Defendants

Neither § 1988(b) nor § 2000e–5 distinguish between prevailing plaintiffs and prevailing defendants. However, the Supreme Court has developed two distinct standards—one for prevailing civil rights plaintiffs and another for prevailing civil rights defendants. Relying on Congress's intent to cast civil rights plaintiffs in the role of private attorneys general, and on the fact that attorney's fee awards to prevailing plaintiffs are necessarily awarded against violators of federal law, the Supreme Court has held that a prevailing civil rights plaintiff should ordinarily recover his attorney's fees unless special circumstances would render such an award unjust. *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 416—18, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978).

■ A far more rigorous standard applies to fee awards to prevailing defendants in civil rights cases. A prevailing defendant may recover its attorney's fees only where it establishes that the plaintiff's actions were frivolous, unreasonable, or without foundation, even though the action was not brought in subjective bad faith. *See Hensley v. Eckerhart,* 461 U.S. 424, 429 n. 2, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Christiansburg Garment,* 434 U.S. at 422, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978); *Cone Corp. v. Hillsborough County,* 157 F.R.D. 533, 540 (M.D.Fla.1994). The United States Supreme Court has also made it clear that a litigant's duty to avoid frivolous litigation is a continuing obligation. *Christiansburg,* 434 U.S. at 422, 98 S.Ct.

694; *Turner v. Sungard Business Systems, Inc.*, 91 F.3d 1418, 1423 (11th Cir. 1996). Advocacy of a claim after it is clearly no longer tenable may subject the plaintiff to attorney's fees even though the complaint was not initially frivolous. *Christiansburg*, 434 U.S. at 422, 98 S.Ct. 694.

The standard for awarding attorney's fees to a prevailing defendant is a stringent one. *See Hughes v. Rowe*, 449 U.S. 5, 14, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980); *Walker v. NationsBank of Florida, N.A.*, 53 F.3d 1548, 1558 (11th Cir.1995). A case is frivolous if it is "so lacking in arguable merit as to be groundless or without foundation." *Sullivan*, 773 F.2d at 1188 (citing *Jones v. Texas Tech Univ.*, 656 F.2d 1137, 1145 (5th Cir.1981)). A court must not focus on whether the claim was ultimately successful in determining frivolity. *Id.* In applying the test, the court must remain cognizant of the Supreme Court's caution that:

> [i]n applying these criteria, it is important that a district court resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success. No matter how honest one's belief that he has been the victim of discrimination, no matter how meritorious one's claim may appear at the outset, the course of litigation is rarely predictable. Decisive facts may not emerge until discovery or trial. The law may change or clarify in the midst of litigation. Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit.

*Christiansburg*, 434 U.S. at 421—22, 98 S.Ct. 694.

Typical "frivolity" cases include those where summary judgment is decided in favor of the defendant or on a Fed. R.Civ.P. 41(b) motion for involuntary dismissal where the plaintiffs do not introduce any evidence in support of their claims. *See Sullivan*, 773 F.2d at 1189. A case is not frivolous where the plaintiffs provide sufficient evidence to support their claims. *Id.* Yet, where a plaintiff continues to litigate even after the claim was clearly groundless, frivolous, or unreasonable, an award of fees may be proper. *See Turner v. Sungard Business Systems, Inc.*, 91 F.3d 1418, 1423 (11th Cir.1996).

While the inquiry is not subject to immutable rules, the Eleventh Circuit looks to three factors in determining whether a prevailing defendant is entitled to an award of attorney's fees: 1.) whether plaintiffs established a prima facie case; 2.) whether defendant offered to settle; and 3.) whether the action was decided on dispositive motions rather than at a trial on the merits. *See Head v. Medford*, 62 F.3d 351, 356 (11th Cir.1995); *Sullivan v. School Bd. of Pinellas County*, 773 F.2d 1182, 1189 (11th Cir.1985); *Cone*, 157 F.R.D. at 541.

In applying these three factors, the Court must remain cognizant of the definition of frivolity—whether an argument is "so lacking in arguable merit as to be groundless or without foundation." *See Sullivan*, 773 F.2d at 1188. Courts applying the three factors have been reluctant to award fees unless the plaintiffs refused to acknowledge clear precedent or asserted a claim which was based knowingly on a nonexistent interest. *See Head*, 62 F.3d at 356; *Cone*, 157 F.R.D. at 540. A defendant is not entitled to an award of attorney's fees and costs simply because it prevailed in summary judgment. *See, e.g.,*

*Head,* 62 F.3d at 356 ("merely because plaintiff did not ultimately prevail on her federal claims does not determine that her claims were groundless"). Rigid application of these factors would lead to a result that Congress did not intend—that any defendant who prevailed on a dispositive motion would be entitled to fees.

**D. The Amount of an Attorney's Fee Award**

Historically, the federal courts have analyzed demands for attorney's fees pursuant to *Johnson v. Georgia Highway Express,* 488 F.2d 714 (5th Cir.1974). *Johnson* set forth twelve factors to be considered in calculating a fee award.[3] The United States Court of Appeals for the Eleventh Circuit has consistently refined calculation of awards of attorney's fees to comport with decisions of the United States Supreme Court. *Norman v. Housing Authority,* 836 F.2d 1292, 1299 (11th Cir. 1988). *Norman* adopted the lodestar approach for calculating attorney's fees. The lodestar approach presumptively incorporates the twelve factors adopted in *Johnson,* 488 F.2d 714. *Norman,* 836 F.2d at 1298–99. The Eleventh Circuit applies the lodestar approach of *Norman* in determining a reasonable attorney's fee. *See Camden I Condominium Assoc., Inc. v. Dunkle,* 946 F.2d 768, 772 (11th Cir.1991); *see also Burlington v. Dague,* 505 U.S. 557, 562, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992). Simply stated, the lodestar is the product of the number of reasonable hours expended and the reasonable hourly rate. *Burlington v. Dague,* 505 U.S. 557, 559–60, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992)

citing *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986).

The lodestar approach also governs the attorney's fees analysis under fee-shifting statutes. *City of Burlington v. Dague,* 505 U.S. 557, 561–62, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992) (lodestar figure has become the guiding light of our fee-shifting jurisprudence). This Court therefore applies the *Norman* lodestar approach in determining the parties' request for attorney's fees.

1. *Reasonable Hourly Rate*

■ The Court must first determine the reasonable hourly rate. *Duckworth v. Whisenant,* 97 F.3d 1393 (11th Cir.1996); *Loranger v. Stierheim,* 10 F.3d 776, 781 (11th Cir.1994); *Norman v. Housing Authority,* 836 F.2d 1292, 1299 (11th Cir. 1988). The reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services provided by lawyers of reasonably comparable skills, experience, and reputation. *Norman,* 836 F.2d at 1299. The party seeking attorney's fees bears the burden of producing "satisfactory evidence that the requested rate is in line with prevailing market rates," which normally requires "more than the affidavit of the attorney performing the work." *Loranger,* 10 F.3d at 781, citing *Norman,* 836 F.2d at 1299. The court may consider direct evidence of rates for similar services or opinion evidence about rates. *Norman,* 836 F.2d at 1299.

---

**3.** Those twelve factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. 488 F.2d at 717—9.

The Eleventh Circuit looks to skill as the ultimate determinate of compensation level because experience and reputation are a mirror image of skill. *Norman,* 836 F.2d at 1300. Skill is evidenced by an attorney's initial case assessment, continuing negotiation and settlement attempts, persuasiveness, and other fundamental aspects of organization and efficiency. *Norman,* 836 F.2d at 1300—1301. Organization means that counsel plans effective discovery devices and does not use them randomly or for the mere purpose of going through established routines. Efficiency means doing exactly what needs to be done in a minimum time. *Norman,* 836 F.2d at 1301. Legal skill, therefore, correlates to a knowledge of both trial practice and substantive law. *Norman,* 836 F.2d at 1301. Although an attorney who must familiarize himself or herself with either aspect of practice may prove exemplary as an advocate, he or she does not have a right to claim comparable skill to attorneys whose first actions are directed at the finer points of the case. *Norman,* 836 F.2d at 1301. Proficiency should yield efficiency, and the district court has ample discretion to discount the import of counsel's expertise. *Varner v. Century Finance Company, Inc.,* 738 F.2d 1143, 1149 (11th Cir.1984). No two attorneys possess the same skill, therefore the Court must look to the range provided by the evidence, and interpolate a reasonable market rate. *Norman,* 836 F.2d at 1300. In summary, the Court determines a reasonable rate by assessing the range of fees established in the marketplace, as modified by reference to an individual attorney's skill. *Norman,* 836 F.2d at 1301; *e.g., Duckworth,* 97 F.3d at 1396.

### 2. *Reasonable Hours Expended*

██ The second step in determining the lodestar is to assess the reasonable number of hours expended in the litigation. *Norman,* 836 F.2d at 1302. Inquiry into the reasonable number of hours focuses on the exercise of "billing judgment"—exclusion of those hours not reasonably billable to a client irrespective of counsel's skill, therefore the Court must deduct for redundant hours. *Norman,* 836 F.2d at 1301–02, citing *Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). A court must not consider an attorney's skill at this stage as this would constitute a double penalty—the rate would first be decreased and the hours would then be lowered. *Norman,* 836 F.2d at 1301.

The fee applicant bears the burden of documenting the appropriate number of hours. *Norman,* 836 F.2d at 1303, citing *Hensley,* 461 U.S. at 437, 103 S.Ct. 1933; *United States v. Blue Cross and Blue Shield of Florida, Inc.,* 882 F.Supp. 166, 170 (M.D.Fla.1995). Generalized statements concerning reasonableness are of little or no assistance to the Court, instead proof of the hours dedicated to litigation and any corresponding objections must be made with sufficient specificity. *Duckworth,* 97 F.3d at 1397—98; *Norman,* 836 F.2d at 1301. Throughout the calculation of the lodestar, the Court remains cognizant that it is itself an expert on the question, and may consider the request in light of its own knowledge and experience with or without the aid of witnesses as to value or hours dedicated to litigation. *Loranger,* 10 F.3d at 781; *Norman,* 836 F.2d at 1303.

## II. *APPLICATION*

### A. Factual Background

The facts have been fully developed in the Court's prior orders of August 14, 2000 and August 17, 2000 granting Defendants' Motions for Summary Judgment, which are incorporated herein. *See* Docket Nos. 240 and 244. However, for purposes of

this motion, it is necessary to reiterate some of those facts here.

### 1. The Promotion Process

The rank structure in the Fire Department is as follows: fire chief, deputy chief, assistant chief, district chief, lieutenant, engineer, and firefighter. Recruits enter as firefighters and progress through the ranks. Candidates must pass an examination to qualify for promotion to lieutenant, district chief, and assistant chief. To be eligible for testing, candidates must satisfy the service, discipline, training, and educational requirements in the Orlando Civil Service Board Code of Rules and Regulations ["Civil Service Rules"], and in the collective bargaining agreement. All who pass the examination are placed on the eligibility list. Promotions to the rank of below lieutenant are governed by the collective bargaining agreement. According to the collective bargaining agreement, the fire chief makes promotions to engineer and lieutenant from candidates with the top five scores on the eligibility list. After the top five candidates have been promoted, the fire chief must then promote from among the next top five candidates. This process continues until the eligibility list is either exhausted or expires.

Nearly every two years, the City considers promotions to district chief and assistant chief. Unlike the engineer and lieutenant promotions, the district chief and assistant chief promotions need not be based on a candidate's score. The fire chief has discretion, subject to the Orlando Civil Service Board's approval, to select candidates from anywhere on the eligibility list. Promotions to district chief need not be made in order of test score.

The fire chief selects the person whom he believes is the best candidate for the position from the eligibility list. The chief considers several factors, including edu-cation, experience, training, test scores, involvement in the community, disciplinary record, leadership skills, and dedication to the fire department. When selecting candidates, each fire chief uses his own set of factors, based upon his own philosophy and understanding as to the fire department's needs. The plaintiffs here alleged that the City, through Chief Harkins, implemented paramedic certificate and a four-year college degree as requirements or significant factors to be considered for promotion to any position above lieutenant. They claimed that the paramedic certification and four-degree, when combined, have a disparate impact on the black promotional candidates for the district chief.

The fire chief's selections are subject to meaningful administrative review. Rule 12.01 of the Civil Service Rules permits a candidate on a eligibility list to seek review by the Orlando Civil Service Board, and to challenge promotional selections. On review, the Board considers all evidence presented, including witness testimony, before it votes on the matter being challenged. The City also provides to the Board any documents requested by the aggrieved individual. The Board has the authority to reject, reverse, or override the fire chief's promotional recommendations under Rule 8.03 and Rule 12.01 of the Civil Service Rules.

### 2. The 1996 and 1998 District Chief Promotions

Hill and Pride [4] are African–Americans who served as lieutenants in the Orlando Fire Department. In 1995, Hill and Pride each passed an examination for promotion to district chief. Hill and Pride, therefore, were on the eligibility list for the 1996 promotion to district chief along with twenty-six other candidates. Jerelds

---

4. Pride retired in June 1999, and Hill remains a lieutenant.

failed the promotion exam and was not placed on the eligibility list.

In making his promotional recommendations in 1996, Harkins reviewed the candidates' personnel, training, and disciplinary (SIS) files, and invited them for an interview. Harkins also considered feedback and suggestions from others in management who were familiar with the candidates. In making his selections, Harkins considered many factors including, seniority, experience, training test scores, education, certificates, disciplinary records, and leadership. Three Caucasian candidates were promoted in 1996. Neither Hill nor Pride sought review from the Civil Service Board of the 1996 promotions. The Board approved Harkins's 1996 recommendations for promotion to district chief without opposition or challenge.

The City's district chief eligibility list did not expire until September 1997. Persons passing the biennial test were merged into the existing eligibility list. As a result, candidates could be on the district chief eligibility list for more than two years without being promoted. Before the 1998 district chief examination, but before this lawsuit was filed, the Civil Service Rules were amended. The district chief list now expires every two years. The 1998 district chief eligibility list is the last "merged list." It expired in 2000 when the Civil Service Board certified a new list. Candidates on the 1998 district chief list who had not been promoted by the time the list expired will have to pass the next district chief promotional examination in order to be eligible for promotion to district chief.

Before the 1998 district chief examination, Chief Harkins strongly encouraged all candidates on the 1995 district chief eligibility list to take the 1998 examination, and promised to give them additional consideration. Only five candidates on the 1995 list took and passed the 1998 district chief examination. Neither Hill nor Pride took the 1998 examination. Nevertheless, in July 1998, Hill and Pride remained on the district chief eligibility list along with eighteen other candidates. Chief Harkins recommended two Caucasian candidates for promotion in 1998: James M. Hill and Tim Griner. Both Caucasian candidates had taken and passed the 1998 examination. James M. Hill had a master's degree, and Griner had a bachelor's degree. Both were paramedics. Neither Hill nor Pride sought the Board's review of the 1998 promotions. The Board approved Harkins's 1998 recommendations for promotion to district chief without opposition or challenge. After the administration of the 1998 examination, only candidates who have passed the 1998 examination have been promoted to district chief.

### 3. *The Assistant Chief Promotions*

Roy E. Jerelds is an African American who served as a District Chief at the time of filing this complaint. In 1995, Plaintiff Jerelds took the examination for the position of assistant chief. Jerelds failed the promotion exam and was not placed on the eligibility list. The promotions to the position of assistant chief went to Caucasian employees who were on the eligibility list.

Jerelds filed an appeal to the Orlando Civil Service Board challenging his failure of the 1995 assistant chief examination. A hearing was held on May 24, 1995, before Board members G.J. Fernandez (Chairman) (Hispanic male), W., Gene Grace (African American male), Thelma McNeil (African American female), and Irene Pope (Caucasian Female). At the hearing, Jerelds raised essentially the same issues about testing process before the Board as he does in this lawsuit. After hearing the facts, the Board voted to reject Jerelds's challenge and request to be placed on the assistant chief eligibility list.

## B. Litigation History

Jerelds filed two charges of discrimination regarding the 1995 promotion exam. On August 7, 1995, Jerelds filed a charge with the Orlando Commission on Human Relations when he failed the exam, claiming that he had been discriminated against because of his race. Docket No. 260, Exhibit B. Later, on December 10, 1996, Jerelds, Hill, and Pride filed class charges with the Employment Opportunity Commission ("EEOC") alleging race discrimination. Docket No. 80, Ex. A. Specifically, the plaintiffs alleged that the City implemented new criteria for promotion, college degree and paramedic certification, in order to eliminate black candidates. On June 17, 1997, the EEOC issued a Letter of Determination finding that there was reasonable cause to believe that "Title VII of the Civil Rights Act of 1964 was violated and that the Plaintiffs and other similarly situated blacks were victims of discrimination as well." Docket No. 80, Ex. B. On May 12, 1998, the United States Department of Justice issued a Notice of Right to Sue based upon the finding of discrimination against the plaintiffs and the class they sought to represent. Docket No. 80, Ex. C.

On July 20, 1998, plaintiffs Jerelds, Hill, and Pride filed a class action complaint against the City of Orlando, on behalf of themselves and all other persons similarly situated. Docket No. 1. Specifically, plaintiffs alleged a class action claim pursuant to Title VII and § 1981 against the City based upon a theory of disparate impact. Docket No. 44 at 1. Plaintiffs claimed that the Fire Department, through Chief Harkins, implemented additional promotional requirements, i.e., paramedic certifications and a four-year degree, with the intent of eliminating African–American candidates from promotional competition. Plaintiffs claimed that the Fire Department discriminated against them and all African American cans who sought a promotion above the rank of lieutenant. Plaintiffs sought injunctive relief (enjoining the use of the college degree and paramedic certification as requirements for promotion) on behalf of all putative class members.

Plaintiffs also filed individual claims against the City. Plaintiffs Jerelds, Hill, and Pride alleged Title VII, § 1981, and § 1983 claims against the City for disparate treatment. Jerelds also alleged racial discrimination in the grading of the 1995 assistant chief examination that he failed.

Pursuant to Fed.R.Civ.P. 23(c)(1), plaintiffs' class motion certification was due on October 28, 1998. On February 22, 1999, after two extensions of times, plaintiffs filed their motion for class certification. Docket No. 43. In their class certification motion, plaintiffs sought to represent: "all present and future black employees of the City of Orlando Fire Department who seek promotion to any rank above Lieutenant." Docket No. 43. Plaintiffs claimed that the paramedic certification and a four-year degree, when combined, had a disparate impact on the black promotional candidates for the district chief and assistant chief positions in violation of Title VII and § 1981. Docket No. 44 at 1. On April 8, 1999, the Court denied the plaintiffs' motion for class certification, and the case proceeded on the claims of the three individual plaintiffs. Docket No. 67.

On June 10, 1999, plaintiffs then sought to amend their complaint to add a retaliation claim on behalf of plaintiff Jerelds and to add Fire Chief Donald Harkins as a party. Docket No. 75. On July 1, 1999, by endorsed order, the Court granted plaintiffs' motion to amend their complaint. See Docket No. 75. On July 15, 1999, defendants moved for dismissal, or in the alternative, for partial summary judgment of Hill's and Pride's 42 U.S.C. §§ 1981 and 1983 claim against Chief Harkins on the

grounds that defendant Chief Harkins was entitled to qualified immunity. Docket No. 82. Defendants also sought dismissal of Jerelds's retaliation claim, alleging that Jerelds had not exhausted his administrative remedies prior to filing his retaliation claim. Docket No. 32.

On August 19, 1999, less than one month before the amendment deadline of September 15, 1999, while the motion to dismiss, or in the alternative for partial summary judgment was pending, plaintiffs sought, for the second time, to amend their pleading to add a claim based on a new legal theory of Title VII disparate impact. Docket No. 91. Specifically, Hill and Pride alleged that Harkins's consideration of a paramedic certification and college degree caused a disparate impact on all African Americans within the City of Orlando's Fire Department. On September 29, 1999, this Court granted plaintiffs' second motion to amend their complaint. *See* September 29, 1999 Endorsed Order.

Plaintiffs' September 29, 1999 second amended complaint set forth the following five counts: 1.) Jerelds's, Hill's, and Pride's disparate treatment claims under Title VII against the City of Orlando; 2.) Hill's and Pride's disparate impact claims under Title VII against the City of Orlando; 3.) Hill's and Pride's § 1981 and § 1983 disparate treatment claims premised upon violations of the Fourteenth Amendment against Chief Harkins, in his individual capacity; 4.) Hill's and Pride's disparate treatment claims under § 1981 and § 1983 against the City of Orlando; and, 5.) Jerelds's retaliation claim under Title VII against the City of Orlando. Docket No. 96.

On October 8, 1999, the defendants again moved for dismissal, or in the alternative, for partial summary judgment on Hill's and Pride's 42 U.S.C. §§ 1981 and 1983 claim against Chief Harkins on the grounds that defendant Chief Harkins was entitled to qualified immunity. Docket No. 98. Defendants also sought dismissal of Jerelds's retaliation claim, claiming that Jerelds had not exhausted his administrative remedies prior to filing his retaliation claim. Docket No. 98.

On January 4, 2000, approximately three-and-a-half months after the amendment deadline, and while the motion to dismiss and motion for partial summary judgment was pending, plaintiffs filed a motion seeking to amend their complaint for the third time. Docket No. 121. Plaintiffs sought to add a retaliation claim on behalf of defendant Hill based on events occurring after the September 1999 amendment deadline. The Court denied plaintiffs' motion.

On February 7, 2000, defendants sent plaintiffs' counsel a letter stating that the City would seek Rule 11 sanctions if Jerelds did not withdraw his retaliation claim. Docket No. 251, ¶ 62. Defendants also prepared and sent plaintiffs a draft motion for sanctions. *Id.* On March 2, 2000, Jerelds withdrew his retaliation claim. Docket No. 133. Jerelds, however, retained his race discrimination claim arising out of the 1995 assistant chief's exam.

On April 3, 2000, the City of Orlando moved for summary judgment against plaintiff Jerelds's discrimination claim. Docket No. 140. Also on that date, the City of Orlando and Chief Harkins filed a motion for summary judgment against plaintiffs Hill and Pride. Docket No. 141. On June 27, 2000, Magistrate Judge Glazebrook recommended dismissal of Jerelds's disparate treatment claim included in Count I. Docket No. 194. On August 14, 2000, after a hearing on the matter, the district court adopted the magistrate judge's Report and Recommendation, granting summary judgment against Jerelds. Docket No. 240. On August 17, 2000, the district court granted summary

judgment in favor of the defendants on each of Hill's and Pride's claims. Docket No. 244.

On September 27, 2000, defendants filed their present motion for attorney's fees, expert fees, and expenses pursuant to 42 U.S.C. § 2000e–5(k), 42 U.S.C. § 1988, 28 U.S.C. § 1927 and this Court's inherent authority. Docket No. 250. Defendants initially sought to recover $417,538 in attorney's fees and over $75,735 in paralegal costs. Docket No. 252, ¶¶ 13, 14. Defendants filed no documentation (*i.e.,* billing records) in support of their requested fees, hoping to supply such documentation upon a finding from this Court that fees were indeed warranted. *See* Docket Nos. 250, 252. Plaintiffs filed a memorandum in opposition on October 18, 2000. Docket No. 260. On November 16, 2000, the undersigned magistrate judge heard arguments on defendants' motion. Docket No. 265. At the November 16, 2000 hearing, the undersigned directed counsel to meet in an attempt to agree on the reasonable amount of fees and costs. The Court further required defendants to file proposed findings of fact and conclusions of law. On December 21, 2000, counsel filed their proposed findings together with documentation supporting defendants' requested fees and costs. Docket No. 280. On January 5, 2001, plaintiffs filed objections to the defendants proposed findings. Docket No. 282. Plaintiffs identified the hours objected to, but provided not a single reason for their objections.

In the meantime, the plaintiffs appealed this Court's grant of summary judgment in favor of defendants only with respect to their Title VII claims. Docket No. 249. On January 18, 2001, the case was forwarded to the United States Court of Appeals for the Eleventh Circuit for review. On April 9, 2001, the Eleventh Circuit

affirmed the district court's decision.[5] Docket No. 288.

## C. ANALYSIS

The undersigned is completely familiar with all aspects of this three-year old heavily contested case, including the settlement conference before the undersigned, the factual and legal claims advanced during litigation, the discovery tactics used in this case, and counsel's conduct during litigation of this case. After carefully considering the record and arguments, and being fully appraised of the parties' conduct in this case, the undersigned finds that: 1.) defendants are entitled to fees and expenses against plaintiffs and their counsel under 28 U.S.C. § 1927 for pursuing the frivolous class action claim; 2.) defendants are entitled to fees and expenses against plaintiff Jerelds and his counsel under 42 U.S.C. § 1988 for pursuing the frivolous retaliation claim; and 3.) defendants are entitled to fees and expenses against plaintiffs and their counsel under 42 U.S.C. § 2000e–5(k), 42 U.S.C. § 1988, 28 U.S.C. § 1927, and this Court's inherent powers, for pursuing the §§ 1981, 1983, Title VII disparate treatment and impact claims after the close of discovery, March 2, 2000, when plaintiffs and their counsel knew that their claims were frivolous.

The *Sullivan* factors support this conclusion. The first *Sullivan* factor—whether plaintiff established a prima facie case—weighs in the defendants' favor. This Court assumed, *arguendo,* that plaintiffs had established prima facie cases with respect to their disparate treatment claims in order to resolve the summary judgment motions. But the Court did not find that plaintiffs had in fact established a prima facie case. The evidence shows that the promotions at issue were made pursuant to sound discretionary business decisions

---

**5.** The file was not available to the district court during appeal.

with no racial animus. Plaintiffs proved nothing to the contrary. In addition, plaintiffs failed to make out a prima facie case with respect to the municipal liability claim under § 1981 and § 1983 and the disparate impact claims. *See* Docket No. 244 at 23—39, 33—35.

The second *Sullivan* factor—whether the defendant offered to settle—also weighs in the City's and Chief Harkins's favor. Although the City did not offer plaintiffs a promotion or money, it did offer to waive attorney's fees estimated at $400,000 in return for a settlement. The offer was made in good faith and was reasonable in light of the groundless claims. Plaintiffs rejected the City's settlement offer.

The third *Sullivan* factor—whether the action was decided on a dispositive motion rather than at a trial on their merits—also weighs in the City's and Chief Harkins's favor. The Court dismissed the case prior to its reaching the trial stage. The district court granted defendants' summary judgment motions, in most part, because plaintiffs had failed to cast doubt on the City's proffered nondiscriminatory reasons for not promoting the plaintiffs. As detailed below, the City articulated legitimate, nondiscriminatory reasons for not promoting plaintiffs; namely, Jerelds did not pass the 1995 promotional exam and the City considered Hill and Pride to be less qualified than the five persons promoted.

Jerelds sought to establish pretext by suggesting that the exam was graded with racial animus. Hill and Pride sought to establish pretext by claiming that the paramedic certifications and four-year college degree requirements were added to eliminate plaintiffs (and African–Americans) from promotions. However, plaintiffs failed to introduce *any* evidence supporting their allegations. No evidence was presented casting doubt on the genuineness of the City's and Chief Harkins's

decisions. This resulted in the summary disposition of plaintiffs' claims on dispositive motions rather than at trial on the merits. The defendants are clearly the prevailing parties in this suit.

### 1. *Class Certification*

On April 8, 1999, the Court dismissed plaintiffs' class action claim. Docket No. 67. As prevailing parties in this case, defendants contend that they are entitled to reimbursement of all fees associated with defending this frivolous class action under § 1927 and § 1988. The Court agrees.

In their class certification motion, plaintiffs Hill, Jerelds, and Pride sought to represent a class consisting of: "all present and future black employees of the City of Orlando Fire Department who seek promotion to any rank above Lieutenant." Docket No. 43. Plaintiffs claimed that the paramedic certification and a four-year degree, when combined, had a disparate impact on the black promotional candidates for the district chief and assistant chief positions.

It is well established that to have standing to sue as a class representative it is essential that a plaintiff be part of that class; that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents. *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). Jerelds failed the 1995 promotional examination, and therefore did not qualify for the promotion. Jerelds lacked standing to challenge Harkins's paramedic certificate and college degree considerations. Indeed, in his deposition, Jerelds admitted that he had never been denied a promotion (and thus had never suffered an injury) for lack of a paramedic certificate or four year college degree. Jerelds Dep., p. 127—28. Thus,

Jerelds clearly was ineligible to represent a class of persons who did allegedly suffer injury.

Likewise, plaintiffs Hill and Pride lacked standing to represent the class as defined. The class sought to include all black employees of the Fire Department who sought promotions to any rank above lieutenant, *i.e.,* assistant chief and district chief. However, while plaintiffs presented evidence showing that the paramedic certification and college degree were factors considered in the promotions to district chief, they presented no evidence showing that those factors were ever used in the promotions to **assistant chief.** There was absolutely no basis to assert a claim of disparate impact relating to the assistant chief position.

Plaintiffs' disparate impact claim as it relates to promotions for the **district chief** promotion was likewise fundamentally flawed. The plaintiffs claimed that there were 39 black employees in the Fire Department that did not have a paramedic certificate and a four year degree—and, therefore, they would not be promoted to the district chief position. Of those 39 employees, only three, Hill, Pride, and Larry Johnson were identified as having been eligible for promotion to district chief. Other than these three individuals, plaintiffs failed to estimate the number of black employees who were denied promotions for which they were qualified. The number of future employees who would have been eligible for a promotion above the rank of lieutenant was speculative. Only three known class members had been identified. A three-member class lacks the numerosity required under Rule 26. The pursuit of a class was improper.

Plaintiffs claim to have relied on the EEOC's finding that there was reasonable cause to believe that Title VII was violated. Docket No. 262 at 23—29; Docket No. 200, Ex. C at 2. Any such "reliance" was misplaced. The EEOC limited its investigation and determination to plaintiffs' Title VII disparate treatment claim—not the disparate impact claim actually alleged by plaintiffs. Docket No. 104 at 13. Moreover, plaintiffs' counsel had a duty both to this court and to their clients to engage in the necessary research to determine the merits of a class action. They cannot rely blindly on an EEOC right-to-sue finding. The EEOC did not make a determination that plaintiffs had constitutional standing and satisfied the requirements of Rule 23. *See* Docket No. 104 at 3. Putative class counsel know that the law requires that both class representatives and putative class members must have suffered an injury in fact to have constitutional standing.

Instead of carefully investigating the factual basis for a class action claim, plaintiffs' counsel sent every Orlando City Commissioner and the Mayor of Orlando a copy of a letter in which plaintiffs' counsel, Don Stephens, states that if the City does not meet plaintiffs' demands, there will be litigation and plaintiffs will "organize a national boycott to impact the City of Orlando fiscally. Said boycott will also appraise the world of the city's practices." *See* Docket No. 283, Ex. B, September 8, 1997 letter from attorney Stephens. Clearly, plaintiffs hoped to gain some negotiating leverage over the defendants by threatening them with an expensive class action lawsuit.

This Court finds the pursuit of the class action to be frivolous as of initiation. Plaintiffs vexatiously and unreasonably multiplied the proceedings. Plaintiffs and their counsel acted with something akin to bad faith. There was never any basis for pursuing a class action against the City. The City spent an enormous amount of time defending against the pursuit of the

class action. *See* Docket No. 262 at 50—51. Defendants are entitled to an award of fees and costs under 28 U.S.C. § 1927 and 1988 in connection with pursuit of this frivolous class action.

### 2. *Jerelds's Retaliation Claim*

The City of Orlando contends that Jerelds's retaliation claim was inconsistent with the EEOC charges upon which they were based. Jerelds voluntarily dismissed his claim. The City argues that as a prevailing party, it is nevertheless entitled to reimbursement for fees incurred in defending Jerelds's frivolous claim. In order to recover fees under § 1988, the City must show that it was a "prevailing party" for purposes of Title VII. If successful, the City must then show that the underlying action was frivolous, unreasonable, or groundless.

Under the Supreme Court's recently announced standard, to obtain prevailing party status, the City and Chief Harkins must be able to point to a judicial declaration to his benefit. Here, the City and Chief Harkins obtained summary judgment against *all* the race discrimination claims advanced by Jerelds, Hill, and Pride. The City was also able to obtain a voluntary dismissal of Jerelds's retaliation claim. Clearly, the City and Chief Harkins are prevailing parties in this suit. Jerelds cannot avoid sanctions relating to his retaliation claim simply by dismissing the retaliation claim in order to avoid an unfavorable judgment on the merits.

Next, the Court determines whether Jerelds retaliation claim was frivolous. In his second amended complaint, Jerelds alleged that the individuals sitting as assessors in his 1995 promotional exam were individuals with whom he had come into contact in his capacity as an EEO officer

for the City in 1979 through 1984. Jerelds claims that these assessors retaliated against him for his past activities twenty years earlier as an EEO officer by giving him a failing score on his 1995 promotional exam.[6]

Defendants contend that Jerelds's claim is frivolous because he failed to exhaust his administrative claim. Specifically, defendants argue that Jerelds's EEOC charge was based on race discrimination, not retaliation. Moreover, defendants claim that Jerelds's activities as an EEO officer, occurring over 20 years earlier, is not reasonably related to his EEOC charge of race discrimination. This Court need not address this issue, because it finds that the fundamental problem with Jerelds's claim is not one of exhaustion, but rather of "causal link."

Jerelds and his counsel should have known before filing suit that Jerelds was unable to establish the necessary causal link between the protected activity (participation as an EEO officer in 1979 through 1984) and the allegedly adverse employment actions (the failing score on his 1995 exam). *See Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501 (11th Cir.2000) (stating that to establish a prima facie case of retaliation, an employee must show that there is some causal relationship between the protected expression and the adverse employment action); *Accord Goldsmith v. City of Atmore*, 996 F.2d 1155 (11th Cir.1993). The passage of time between this adverse action—coming more than 20 years after the protected activity—is far greater than periods of time in other cases that were found to be insufficient evidence of a causal link. *See, e.g., Hughes v. Derwinski*, 967 F.2d 1168, 1174—75 (7th Cir.1992)

---

**6.** Jerelds's allegations of retaliation are conclusory and unsupported by factual assertions.

(four months insufficient). Jerelds's claim is fundamentally defective.

Nevertheless, Jerelds did not withdraw his claim until after the City engaged in discovery, until after the City filed two motions for summary judgment with supporting memorandum, and until after the City sent him a draft Rule 11 motion. Docket No. 151, ¶¶ 57, 62—63. It is clear that Jerelds withdrew his claim to avoid an unfavorable judicial determination that was imminent. Defendants prevailed over Jerelds's legally baseless retaliation claim. Defendants are entitled to fees under 42 U.S.C. § 2000e –5(k).

### 3. Jerelds's Title VII Disparate Treatment Claim

Jerelds's claim of race discrimination in the administration of the 1995 assistant chief examination was without basis in fact or law. The unrefuted evidence showed that Jerelds's test evaluations were based solely upon his performance on the EIC portion of the examination. As this Court previously found, Jerelds failed to produce evidence showing "an inference that [his] race resulted in a lower score." Docket No. 194 at 19. Jerelds failed to produce *any* evidence that persons to whom he compared himself were similarly situated. Docket No. 194 at 16, 16 n. 2, 17, 18. Other than his bald conclusory assertions, Jerelds offered no evidence casting doubt upon the reasons behind the grading of his exam. *Id.* at 18.

At the end of discovery, it should have been patently clear to Jerelds and his counsel that Jerelds would not succeed on his disparate treatment claim against the City based upon his failure of the 1995 assistant chief examination. The City demonstrated legitimate nondiscriminatory reasons for failing Jerelds on the 1995 assistant chief examination. Jerelds provided no evidence tending to show that the City's reasons were a pretext for discrimination. Jerelds's and his counsel's pursuit of this claim was frivolous.

### 4. Hill's and Pride's Title VII Disparate Treatment Claims Against the City

When granting defendants's motion for summary judgment on Hill and Pride's Title VII disparate treatment claims, the Court assumed for purposes of efficiency that the allegations contained in Hill and Pride's Title VII claims met the requirements of a prima facie case of race discrimination under *McDonnell Douglas v. Green,* 411 U.S. 792, 802—805, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The Court, however, made no such ruling. Indeed, the claims either fell short of a prima facie case, or barely sufficed.[7]

Whether the evidence is examined in conjunction with plaintiffs' burden to establish a prima facie case or in conjunction with plaintiffs' burden to establish that the reason given for the promotion selection was a pretext for discrimination, nothing

---

7. To establish a prima facie case of race discrimination with respect to a promotion, each plaintiff was required to prove that: 1.) he is a member of a protected minority; 2.) he was qualified for and applied for the promotion; 3.) he was rejected despite those qualifications; and 4.) another equally or less qualified employee who was not a member of the protected minority was promoted. *See, e.g., Lee v. GTE Florida, Inc.,* 226 F.3d 1249, 1253 (11th Cir.2000); *Carter v. Three Springs Residential Treatment,* 132 F.3d 635, 644 (11th Cir.1998). There is no question that plaintiff Hill and Pride, African–Americans, are members of a protected minority and applied for the assistant chief positions. It is further undisputed that three assistant chief positions were ultimately given to other employees, Caucasians. Hill and Pride also met the minimum qualifications for the assistant chief positions. However, the record clearly showed Hill and Pride were not equally or more qualified than the candidates promoted. Indeed, the candidates possessed both paramedic certificates and a four-year college degree.

shows that the City's promotional decisions were anything but reasonable business decisions with no discriminatory intent. The City demonstrated that Chief Harkins reviewed and considered evaluations, performance, and experience of all the eligible candidates prior to his selection. The *undisputed* evidence established that a paramedic certification and four-year college degree were reasonably related to the district chief position. The City of Orlando considered and promoted candidates to the district chief position that possessed both paramedic certification and four year college degree. Hill and Pride did not possess either criteria. The City provided a non-discriminatory reason for not promoting Hill and Pride—they were not the best qualified for the promotions.

In contrast, Hill and Pride presented no evidence showing that they were equally or more qualified than the promoted individuals. Nor did they present any evidence demonstrating that the paramedic certification and college degree had no direct relationship to the performance of a district chief position. In short, no evidence was introduced showing that the consideration of a college degree and paramedic certification was a pretext for discrimination.

Hill and Pride produced no evidence challenging the accuracy of the statements contained in any of the reviewed files, including Hill's and Pride's files. Hill and Pride also failed to present any evidence to refute the evidence that the promoted candidates were better qualified. Moreover, Hill and Pride presented no evidence, either direct or circumstantial, that Chief Harkins held any racial animus toward any African–American or that he made his promotional decisions based on such animus.

Rather, plaintiffs merely advanced conclusory allegations and unsupported speculations to demonstrate defendants' alleged discrimination.

The *only* purported evidence presented in support of plaintiffs' conclusory allegations was the testimony of two former employees of the Fire Department, Roy McClelland and Albert Nelson. McClelland testified that he believed that Harkins harbored racial animus based upon an incident he observed. Specifically, he saw Chief Harkins imitate an African–American public official, Mable Butler. Nelson testified, generally, that the City had a history of discrimination. However, he also admitted that he had no personal knowledge of the individuals claims. However, Nelson was not part of the decisions at issue, and he testified that he wasn't aware of any intent to discriminate against the individual plaintiffs. Plaintiffs have failed to provide specific facts tending to show racial animus on the part of Chief Harkins or the City. These statements do not relate directly to Chief Harkin's promotional decisions.

Plaintiffs failed to present any legal or factual basis for their claims against defendants. The plaintiffs claims were based solely on the fact that they were African–Americans who were not promoted. Plaintiffs failed to provide any admissible evidence in support of their claims. They simply asserted countless unsubstantiated allegations, leaving it to defendants to incur the time and expense in conducting discovery to demonstrate the falsity of plaintiffs' claims.

Plaintiffs Hill and Pride pursued their Title VII disparate treatment well after discovery proved that their claims were frivolous.[8] Plaintiffs failed to discharge

---

**8.** Plaintiffs reliance on the EEOC letter of determination finding that probable cause existed to believe that a violation of the statute had occurred does nothing to alter the conclusion that after the close of discovery plaintiffs should have known that their claims were without merit.

their obligations to their client and this court by persisting in an action that lacked any basis in fact or law. Even if it was not evident to counsel at the time the complaint was filed, it should have been clear to them after the close of discovery. Plaintiffs and their counsel's actions in litigating through summary judgment was frivolous, unreasonable, and without foundation. On this record, the undersigned has no difficulty in finding that plaintiffs and their counsel unreasonably and vexatiously multiplied these proceedings. Defendants are entitled to recover the fees under § 2000e–5(k), § 1927, and this Court's inherent power.

### 5. Title VII Disparate Impact Claims Against the City and Harkins

To establish a prima facie case of disparate impact discrimination, Hill and Pride must show that the consideration of a four-year college degree and paramedic certificate as factors during the district chief promotion process had a discriminatory impact. See Edwards v. Wallace Community College, 49 F.3d 1517, 1520 (11th Cir. 1995). Plaintiffs failed to meet this standard.

Hill and Pride offered no expert or statistical evidence showing that the challenged practice caused a disparate impact against African–Americans within the qualified applicant pool, i.e., those who were eligible for a promotion to the district chief rank within the fire department. See Docket No. 244 at 34. In contrast, the defendants submitted an expert report by James T. McClave, Ph.D. Dr. McClave concluded that there is "absolutely no support for plaintiffs' allegation that the promotions were racially biased and created a disparate impact against African–Americans." See Docket No. 142, Ex. C. Hill and Pride attempted to discount Dr. McClave's expert opinion by claiming that the sample size was too small to conduct a valid analysis. However, they failed to

support their theory with any probative statistical evidence.

Moreover, the City established that a paramedic certification and four-year college degree is demonstrably necessary to satisfy the City's goal of improving quality service to the public. Docket No. 244 at 34. Plaintiffs provided no evidence to the contrary. In addition, plaintiffs failed to identify an alternative policy that would be comparably as effective as serving the City's goal. Hill and Pride's continued litigation of this patently frivolous claim against the City is sanctionable under § 2000e–5(k), § 1927 and this Court's inherent authority.

### 6. Sections 1981 and 1983 Claims against Chief Harkins

Plaintiffs' pursuit of § 1981 and § 1983 claims against Chief Harkins in his individual capacity were palpably frivolous. It is well-settled that a municipal official performing a discretionary function enjoys qualified immunity from civil liability if his conduct violates no clearly established right of which a reasonable person would have known. Harlow, 457 U.S. at 817–19, 102 S.Ct. 2727.

Once the qualified immunity defense is raised, plaintiffs bear the burden of showing that the federal rights alleged to have been violated were clearly established rights. See Barts v. Joyner, 865 F.2d 1187, 1190 (11th Cir.1989). This burden is not easily discharged: "[t]hat qualified immunity protects government actors is the usual rule; only in exceptional cases will government actor has have no shield against claims made against them in their individual capacities." Lassiter v. Alabama A & M Univ., 28 F.3d 1146, 1149 (11th Cir.1994).

The evidence demonstrated that Chief Harkins's promotional decisions were based on reasonable business consider-

ations with no discriminatory intent. Chief Harkins reviewed and considered many factors including seniority, experience, training, test scores, disciplinary records, leadership skills, commitment to recent education and training, college degree and certifications, including a paramedic certification. Docket No. 244 at 26. Harkins believed that paramedic district chiefs were needed because they had the skills and knowledge to supervise and scrutinize the paramedic's actions. Harkins wanted hands-on, on-site supervision and management of EMS by district chiefs to increase the qualify of patient care, provide quality assurance, and to protect the City from potential liability due to the increased risks involved with advanced treatment and technology. Harkins also believed that a college education assisted a person on the development of organization, written and verbal communication, analytical, cognitive and interpersonal skills—all of which he believed were required by a district chief. *See* Docket No. 244 at 27. As the Court found, Chief Harkins's conduct was objectively reasonable for the purposes of qualified immunity. Docket No. 244 at 29.

Plaintiffs provided no evidence, either direct or circumstantial, that Chief Harkins held any racial animus toward any African–American, or that he made his promotional decisions based on such animus. There were no facts or legal basis to support such claims. Plaintiffs' claim against Chief Harkins was frivolous, unreasonable and without legal foundation. The pursuit of these claims after the close of discovery is sanctionable under § 1988. Further, plaintiffs and their counsel should have conceded the lack of plausible factual or legal basis for the claim against Chief Harkins and dismissed it. By not dismissing the claim against Harkins, plaintiffs' counsel pursued a course that a reasonable attorney would have known at the end of discovery to be unsound. The refusal to

dismiss the § 1981 and § 1983 claims against Chief Harkins was unreasonable and vexatious and, therefore, sanctionable under 1927 and this Court's inherent powers.

7. *Section 1981 and 1983 Claims Against the City of Orlando*

Plaintiffs alleged that the additional paramedic certification and four-year college degree requirement had a disparate impact on African–Americans. Docket No. 96 at 10. Plaintiffs further alleged that the "City was aware of the institution of the additional requirements and their discriminatory impact but nevertheless permitted [Chief Harkins] to use the discriminatory requirements." Docket No. 96 at 10. Plaintiffs claim that their constitutional rights were violated under § 1981 and the Fourteenth Amendment as a result of a custom and policy of the City or as a result of a decision made by the final decision maker, Chief Harkins. None of these allegations were supported by evidence.

As this Court found in granting summary judgment in the City's favor, no evidence was introduced showing that the Board had actual or constructive knowledge of any alleged racial discrimination. *See* Docket No. 244. Plaintiffs provided "no evidence that the City has adopted or promulgated *any discriminatory* policies or customs at the municipal level." Docket No. 244 at 24 (emphasis added). Nothing sufficient was introduced to establish a persistent and widespread practice of racial bias. *Id.*

Moreover, contrary to plaintiffs' unsupported allegations, Chief Harkins was not a "final policymaker." Docket No. 244 at 24. Chief Harkins had discretion, *subject to the Orlando Civil Service Board's approval,* to select candidates from anywhere in the eligibility list for promotion. Chief

Harkins's decisions were constrained by several City and Civil Service Board policies and were subject to meaningful review. Docket No. 244 at 25. Plaintiffs provided no evidence to the contrary. *See* Docket No. 244 at 24. Indeed, plaintiffs Hill and Pride chose not to challenge and appeal Chief Harkins's decision to the Orlando Civil Service Board.

Plaintiffs did not have the factual or legal basis to justify claims of municipal liability under the § 1983 standards. The Court finds that plaintiffs continued litigation after discovery closed was unreasonable and without foundation.

### D. Reimbursement of Fees as Sanctions

The Court takes seriously a request for sanctions and is generally hesitant to impose sanctions. However, sanctions are clearly warranted here. As already discussed, the plaintiffs' class action claims and individual claims against the City of Orlando and Chief Harkins lacked any merit. This action did not turn on subtle, unsettled issues of law, nor did it involve close questions of facts. The Eleventh Circuit has said that when it becomes apparent that discoverable evidence will not bear out the claim, the litigant and his attorney have a duty to discontinue their quest. *Avirgan*, 932 F.2d at 1582 (awarding fees under § 1927). Plaintiffs' counsel clearly breached their duty to discontinue the plaintiffs' claims race after it became apparent, which was no later than the close of discovery on March 2, 2000, that the evidence would not support those claims. After that point, plaintiffs' counsel recklessly asserted a frivolous argument.

An award of attorney's fees against plaintiff's counsel under § 1927 and this Court's inherent power is warranted. Indeed, it seems unfair to saddle the plaintiffs above with the imposition of attorney's fees under the circumstances of this case. *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 768, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980) (Blackmun, J., concurring and dissenting). Clearly, plaintiffs' counsel had the responsibility of evaluating and explaining to the plaintiffs the developing law of race discrimination, a concept that could easily be misunderstood by a lay person. Furthermore, it was obviously plaintiffs' counsel, not the plaintiffs themselves, who were the creators of the changing legal theories proffered on the discrimination claims. Responsibility for pursuing those frivolous theories should not fall exclusively upon the plaintiffs.

Under these circumstances, defendants are entitled to reasonable attorney's fees expended in the defense of this case against plaintiffs and their counsel, jointly and severally, under 1988, 1927, and this Court's inherent powers.

### E. Reasonableness of the Hourly Rates

Having decided that sanctions are appropriate, the court now turns to the issue of the appropriate amount of an award of attorney's fees. Determination of a reasonable attorney's fees begins with the lodestar amount which is calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.

The defendants' motion at Docket 252 sought to recover over $417,538 in attorney's fees incurred in defending this case through the filing of their motion for attorney's fees. Docket No. 251, ¶ 24. After presiding over a lengthy hearing on the entitlement to fees and costs, the Court ordered the parties to meet in an attempt to resolve the reasonable amount of fees incurred.

On December 21, 2000, defendants filed proposed findings of fact and conclusions of law, together with billing records and

supporting affidavits from defendants counsel, Thomas C. Garwood, Jr. and Lori R. Benton. *See* Docket Nos. 278, 279, 280. The billing entries are sufficiently detailed in that they note the number of hours spent on tasks, the subject matter involved, and the nature of the task. The records appear to be an accurate, except for several entries reduced by attorney Benton as a result of professional judgment.

Defendants incurred $506,878,42 in attorney's fees and costs in defending this case. *See* Docket No. 279, ¶ 21. Defendants, however, do not seek to recover that total amount. Rather, defendants seek a total of $215,048.45 in attorney's fees and $40,784.87 in paralegal costs. *See* Docket No. 278, 279, 280. The rates for attorney hours range from $115 to $160 per hour, and the rate for paralegal costs range from $35 to $60. The requested attorney's fees and paralegal costs includes: 1.) $28,305.50 (210.10 hours) in fees defending against plaintiffs' class action efforts and $1,223.50 (21.1 hours) in paralegal costs; 2.) $3,515.00 (22.5 hours) in fees defending Jerelds's retaliation claim and $420 (7 hours) in paralegal costs; and, 3.) $182,477.95 (1,169 hours) in fees defending this case after close of discovery and $40,784.95 (684.9 hours) in paralegal costs. *See* Docket Nos. 279 and 280. In addition, defendants incurred and seek $6,574,80 in computer research fees, $388.43 in travel costs, and $38.24 in overnight mail costs.[9] Docket Nos. 279 and 280. Because no documentation was provided in support of the computer-research fees, these fees ($6,574.80) are disallowed.

Plaintiffs do not challenge the hourly rates charged. *See* Docket Nos 279 and 283. They do, however, object to the majority of the hours spent in litigation. It is well-settled that objections to the number of hours billed must be made with sufficient specificity. *Duckworth*, 97 F.3d at 1397—98. Plaintiffs failed to meet their burden—not one single reason was provided for their objections. *See* Docket Nos. 279, 283. Plaintiffs also failed to challenge the statements contained in Benton's and Garwood's affidavits. *See* Docket Nos. 278, 283.

When, as in this case, a plaintiff fails to challenge a prevailing defendants' affidavit stating that the hourly rates charged were their normal and customary billing rates or to challenge the number of hours attested as spent on the litigation, this Court is hesitant to disregard those uncontested allegations and reduce the award requested. The Court is well aware[10] of the range of reasonable hourly rates prevailing in the relevant legal community—the Orlando Division—for similar services provided by lawyers of reasonably comparable skills and experience. This Court finds that the aforementioned billing rates are reasonable based on defense counsels' high degree of skill as reflected in the record. These rates fall within the usual range of fees in the Orlando Division.

In defending itself against plaintiffs' frivolous claims, the Fire Department and Chief Harkins endured over two years of litigation and completely prepared itself for a jury trial prior to prevailing on summary judgment on the eve of trial. Having carefully reviewed defendants *uncon-*

---

9. The expenses requested, including research fees are properly included only in an award of attorney's fees under Title VII, and not in a cost award. *See* 42 U.S.C. § 2000e–5 (k); *Desisto College v. Town of Howey–in–the–Hills,* 718 F.Supp. 906 (M.D.Fla.1989).

10. Throughout the calculation of the lodestar, the Court considers the defendants' request for attorney's fees in light of its own knowledge and experience as to value and hours dedicated to litigation. The Court routinely considers attorney's fee issues.

*tested* billing statements, this Court finds that defendants' counsel diligently kept fees at a minimum by delegating the work down to be performed by an attorney or paralegal who was billed at a lower rate. In addition, this Court notes that the fees actually incurred in defending the sanctionable claims are significantly more than the fees requested and awarded. In this light, focusing on the exercise of "billing judgment," a total of 1,401.15 attorney hours and 713 paralegal hours falls within the reasonable number of hours necessary to successfully defend the Fire Department and Chief Harkins in this case. Thus, this Court finds that the requested times itemized in the breakdown and requested are reasonable. Docket No. 279, attached Exhibits A–C.

The lodestar in this case is the product of the number of reasonable hours expended and the reasonable hourly rates. This figure equals $215,048.45. Adding the travel costs ($388.43) and overnight mail costs ($38.24), this Court finds that the Fire Department and Chief Harkins incurred a total of $215,475.12 in attorney's fees in this case.

## III. *CONCLUSION*

For the reasons set forth above, it is **RECOMMENDED** that the City of Orlando's and Chief Harkins's motion for attorney's fees and expenses [Docket No. 250] be **GRANTED** in part. It is

**FURTHER RECOMMENDED** that the City of Orlando be awarded against Roy Jerelds, James H. Hill, Reginald Pride, and their counsel, Jacob A. Rose, Bernard A. Lebedeker, and Don Stephens, jointly and severally, $28,305.50 in attorney's fees and $1,223.50 in paralegal fees for defending against the motion for class certification. It is

**FURTHER RECOMMENDED** that the City of Orlando be awarded, against Roy Jerelds, $3,515.00 in attorney's fees

and $420 in paralegal fees for defending against Jerelds's retaliation claim. It is

**FURTHER RECOMMENDED** that the City of Orlando be awarded against James H. Hill, Reginald Pride, and their counsel, Jacob A. Rose, Bernard A. Lebedeker, and Don Stephens, jointly and severally, $182,477.95 in attorney's fees and $40,784.95 in paralegal fees for defending this case after the close of discovery on March 2, 2000. It is

**FURTHER RECOMMENDED** that the City of Orlando be awarded against James H. Hill, Reginald Pride, and their counsel, Jacob A. Rose, Bernard A. Lebedeker, and Don Stephens, jointly and severally, $426.67 in costs for defending this case after close of discovery on March 2, 2000. It is

**FURTHER ORDERED** that any proposed ruling made from the bench during the November 16, 2000 hearing on defendants' motion for attorney's fees and expenses [Docket No. 250], to the extent that it is inconsistent with this Report and Recommendation, is hereby **VACATED.** The Court has since made a full evaluation of the changing case law and record.

Failure to file and serve written objections to the proposed findings and recommendations in this report pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 6.02 within ten days of the date of this report and recommendation shall bar an aggrieved party from a *de novo* determination by the district court of issues covered in the report, and shall bar an aggrieved party from attacking the factual findings on appeal.

Aug. 1, 2001.